[No. S149499. May 28, 2009.]

BONNIE HERNANDEZ, as Administrator, etc., et al., Plaintiffs and Appellants, v.
CITY OF POMONA et al., Defendants and Respondents.

502

504

## COUNSEL

Moreno, Becerra, Guerrero & Casillas, Moreno, Becerra & Casillas, Danilo J. Becerra, Gregory W. Moreno, Arnoldo Casillas and Lizette V. Espinosa for Plaintiffs and Appellants.

Alvarez-Glasman & Colvin, Roger A. Colvin and Sean M. Beehler for Defendants and Respondents.

Dennis J. Herrera, City Attorney (San Francisco), Joanne Hoeper, Chief Trial Deputy, Danny Chou, Chief Appellate Attorney, and Peter J. Keith, Deputy City Attorney, for League of California Cities, California State Association of Counties and City and County of San Francisco as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**CHIN, J.**—We granted review in this case to consider the following question: When a federal court enters judgment in favor of the defendants on a civil rights claim brought under 42 United States Code section 1983 (section 1983), in which the plaintiffs seek damages for police use of deadly and constitutionally excessive force in pursuing a suspect, and the court then dismisses a supplemental state law wrongful death claim arising out of the same incident, what, if any, preclusive effect does the judgment have in a subsequent state court wrongful death action? Based on principles of issue preclusion (collateral estoppel), the Court of Appeal held in this case that the federal judgment precludes plaintiffs from recovering on the theory that the police officers failed to exercise reasonable care in using deadly force, but does not preclude plaintiffs from recovering on the theory that the officers failed to exercise reasonable care in creating, through their preshooting

conduct, a situation in which it was reasonable for them to use deadly force. The Court of Appeal therefore reversed the judgment that the trial court entered for the officers and their employer based on the federal judgment. As explained below, we hold that on the record and conceded facts here, the federal judgment collaterally estops plaintiffs from pursuing their wrongful death claim, even on the theory that the officers' preshooting conduct was negligent. We therefore reverse the Court of Appeal's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Before dawn on January 16, 2001, City of Pomona (Pomona) Police Officer Dennis Cooper was patrolling a neighborhood in a marked black-and-white police vehicle when he saw a gray Ford Thunderbird approach from the other direction with its headlights unilluminated. The Thunderbird abruptly pulled over to the curb and stopped with its engine running. Cooper engaged his overhead lights and pulled his car to within about 10 feet of the stopped Thunderbird, facing it. He saw two individuals inside the Thunderbird and ordered them to exit. The driver complied, putting up his hands, opening his door, and exiting. The passenger, decedent George Hernandez, did not comply. Instead, he slid into the vacant driver's seat and, with the headlights unilluminated, drove off in the direction from which the Thunderbird had come.

Cooper began pursuing Hernandez in the car. Officers Humberto Sanchez, Anthony Luna, Robert Devee and Edgar Padilla joined the pursuit in other police vehicles, including a K-9 unit driven by Luna. Hernandez led the officers on a high-speed chase through city streets that lasted about 18 minutes and ended when Hernandez crashed and the car came to rest in the middle of the street.

---

[1] Because this appeal arises in connection with a demurrer, we look to the "properly pleaded factual allegations" of the operative complaint "read in light of" any "judicially noticeable facts" and "factual concessions" of the plaintiff. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 21 [40 Cal.Rptr.3d 205, 129 P.3d 394].) Plaintiffs' complaint sets forth virtually no facts regarding the events giving rise to this lawsuit. However, plaintiffs have detailed the relevant facts at both oral argument and in the briefs they submitted to us and to the Court of Appeal, and plaintiffs' counsel conceded at oral argument that the evidence plaintiffs would present if permitted to go to trial would be the same as the evidence they presented in federal court. On this record, we may properly treat plaintiffs' representations regarding the facts as factual concessions, and we base both our statement of facts and our substantive analysis on these conceded facts. (See *Evans, supra,* at pp. 20–22; see also *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1152 [281 Cal.Rptr. 827] [treating facts stated in brief as admissions for purposes of determining whether leave to amend should have been granted]; *Moore v. Powell* (1977) 70 Cal.App.3d 583, 586, fn. 2 [138 Cal.Rptr. 914] ["factual statement in a brief may be treated as an admission or stipulation when adverse to the party making it"].)

After crashing, Hernandez exited his car and started running away. Cooper, followed closely by Sanchez, pursued Hernandez on foot. Eventually, Hernandez slowed down and stopped. According to one witness, Hernandez, with his back to Cooper, lifted his shirt to expose his waistline and, while turning around, yelled that he did not have a gun. According to Cooper, Hernandez, after reaching toward his front right pocket, spun towards him yelling, "I got a gun, I got a gun." Startled, Cooper reached for his weapon, but discovered he had lost it. He spun around, covered his head, and ran away screaming to Sanchez: "Shoot him. Shoot him, Bert. He's got a gun. He's going to kill me." As Cooper ran, he broadcast over his radio that Hernandez had brandished a firearm. Hearing Cooper, Luna released the police dog and, with Devee and Padilla, joined the foot pursuit.

Hernandez spun around and started running away again. Sanchez, who was now leading the chase, had an open shot at Hernandez, but decided not to take it because Hernandez was facing away and did not pose an immediate threat. Instead, Sanchez chased Hernandez, yelling at him to stop. He was followed by the other officers, including Cooper, who had rejoined the pursuit after finding his weapon.

Ignoring Sanchez's order to stop, Hernandez kept running and fled around the corner of a building. The police dog passed Sanchez as they rounded the corner of the building, caught up to Hernandez, struck him in the shoulder, and spun him around. According to Sanchez, as the dog was striking Hernandez, Hernandez reached towards his waistband, yelling either "I got a gun" or "Gun." In response, Sanchez fired his weapon at Hernandez. As the other officers rounded the corner of the building, they heard shots and assumed Sanchez was in a gun battle with Hernandez. All but Padilla fired at Hernandez. The officers fired 37 shots in all, hitting Hernandez 22 times and killing him. Hernandez was unarmed.[2]

In September 2001, Hernandez's parents, both individually and as administrators of his estate, and his seven minor children, by and through their guardians ad litem (collectively, plaintiffs), filed a complaint in federal court

[2] In setting forth these facts in their Court of Appeal brief, plaintiffs cited to the federal court's order granting Sanchez's posttrial motion for judgment as a matter of law. At defendants' request, the trial court took judicial notice of this order, and the order is part of the appellate record. It sets forth the following additional facts of interest: An autopsy revealed that Hernandez had methamphetamine in his system. During the vehicle pursuit, the Thunderbird fishtailed as it weaved in and out of traffic at speeds estimated to be in excess of 100 miles per hour, struck a curb and another vehicle, ran several red lights and nearly hit a pedestrian. The vehicle chase ended when Hernandez tried to make a high-speed turn, lost control of his car, and crashed into a newsstand and then a bus stop. We set forth these additional facts merely to fill out the evidentiary presentation during the federal trial; we do not rely on them in our analysis. We note, however, that plaintiffs have never disputed any of them.

seeking damages in connection with his death. As here relevant, the complaint asserted a section 1983 claim against the officers, alleging they had violated Hernandez's rights under "the Fourth and Fourteenth Amendments of the United States Constitution[] to be free from unreasonable seizures and excessive force by police officers." The complaint also asserted a section 1983 claim against Pomona, alleging in part that it was liable for the officers' actions because it (1) "maintained a system of grossly inadequate training pertaining to the use of firearms" and "the proper tactics for managing scenarios involving mentally unstable, emotionally distraught and otherwise psychologically incapacitated persons," and (2) "[a]t the time of the shooting . . . had in place, and had ratified, policies, procedures, customs and practices of" its police department that "permitted and encouraged their officers and officials to unjustifiably, unreasonably and in violation of the Fourth Amendment[], shoot unarmed suspects and specifically individuals of Mexican ancestry, Hispanics, Latinos, as well as members of other minority groups." The complaint also included a wrongful death claim under California law, which alleged that the officers had acted "negligently, violently and without due care," "cause or provocation" in killing Hernandez; that the shooting had "occurred as a result of the absence of due care for the safety of others and constituted an unreasonable, unwarranted, and excessive use of force"; and that Pomona had "failed to adequately train, supervise, discipline or in any other way control" the officers "in the exercise of their unlawful use of excessive and lethal force" and, by "knowingly and negligently fail[ing] to enforce [California] laws" and police "regulations," had "creat[ed]" in the police department "an atmosphere of lawlessness in which [p]olice officers employ excessive and illegal force and violence . . . in the belief that such acts will be condoned and justified by their supervisors."[3]

The federal district court bifurcated the state and federal claims and only the latter went to trial. By special verdict, the jury found that Cooper, Devee and Luna had not "violate[d]" Hernandez's "Fourth and Fourteenth Amendment rights by using excessive force against him." The jury could not reach a verdict regarding Sanchez.[4] Sanchez then moved for judgment as a matter of law, based on qualified immunity. The court granted the motion, finding that because Sanchez's "use of deadly force was reasonable under the circumstances," he "did not violate Hernandez's Fourth Amendment rights." The court reasoned: "Faced with a fleeing suspect that he reasonably believed to be armed and likely to fight back, given Cooper's screams that Hernandez

---

[3] The federal complaint indicates that plaintiffs asserted the wrongful death claim only "as to Defendants City of Pomona, and Does 6 through 10."

[4] According to the parties' briefs in the Court of Appeal, plaintiffs dismissed all claims against Padilla before the federal trial.

was about to shoot him and that he had bran[d]ished a firearm, Officer Sanchez found himself in a situation that he reasonably believed would threaten his life if he did not act immediately. . . . To hold [that his use of deadly force was not reasonable under the circumstances] would force Officer Sanchez to risk looking down the muzzle of a barrel before he could act to protect himself." The court alternatively held that "even assuming Officer Sanchez had violated Hernandez's Fourth Amendment rights," he "is entitled to qualified immunity" because he "was not plainly incompetent," he did not "knowingly violate the law," and he "reasonably could have believed that his conduct was lawful under the circumstances."[5]

Based on its order granting Sanchez's motion and the jury's verdict in favor of the other officers, the federal court ordered that all "[d]efendants shall have judgment on [plaintiffs'] claims for excessive force under the Fourth and Fourteenth Amendments." A few days later, it "dismisse[d] without prejudice all of Plaintiffs' remaining state law claims," explaining that it was "declin[ing] to exercise supplemental jurisdiction over" those claims inasmuch as "the [federal] claims over which it ha[d] original jurisdiction [had been] dismissed."

Plaintiffs then filed this action in the superior court against the same defendants. As here relevant, the complaint included a wrongful death claim based on the same allegations plaintiffs had set forth in the wrongful death claim of their federal complaint.[6]

Defendants demurred to the complaint, arguing in relevant part that the federal proceedings "bar the instant action on the grounds of collateral estoppel." They asserted that in the federal action, the issue of excessive and unreasonable force had been determined in their favor, and that this determination "collaterally estop[s]" plaintiffs "from raising" their wrongful death claim. In opposing the demurrer, plaintiffs argued that collateral estoppel does not apply because "reasonableness" for purposes of a section 1983 claim is not the same as "reasonableness" under state negligence law.

---

[5] At the time of the federal trial, high court precedent *required* the trial court *first* to decide whether Sanchez had violated Hernandez's constitutional rights, and then to decide the immunity question. (*Saucier v. Katz* (2001) 533 U.S. 194, 201 [150 L.Ed.2d 272, 121 S.Ct. 2151] (*Saucier*).) The high court recently changed this rule, holding that trial courts may decide the immunity question before (or without) determining whether there was a constitutional violation. (*Pearson v. Callahan* (2009) 555 U.S. ___, ___–___ [172 L.Ed.2d 565, 129 S.Ct. 808, 815–822].)

[6] Like the federal complaint, the complaint plaintiffs filed in state court indicates that they are asserting the wrongful death claim only "as to Defendants City of Pomona, and Does 6 through 10."

The trial court agreed with defendants in part, explaining: "[D]efendants have had a factual finding by [j]udge or [j]ury in their favor that excessive force was not used in the shooting, i.e., [t]hat the deadly force used was 'objectively reasonable' under the circumstances. Therefore, this issue is res judicata, and collateral estoppel precludes relitigation of this same issue in this action." The court overruled the demurrer, however, because it concluded that the federal court judgment did not preclude plaintiffs from recovering on the theory that defendants failed to summon medical aid and prevented aid from being rendered once available. The court explained: "Although such allegations were contained in those causes of action tried in [f]ederal [c]ourt, no specific findings were made on such issues, and the [federal judgment is] not res judicata."

Plaintiffs, to expedite their appeal from the trial court's ruling that the federal judgment precluded them from proceeding on their allegations that defendants acted unreasonably in shooting Hernandez, agreed to "strike and dismiss, with prejudice," their wrongful death claim insofar as it was based on allegations that defendants failed to summon, and prevented the rendering of, medical aid. Based on this agreement, the parties asked the court to enter final judgment. The court granted the request, dismissed the wrongful death claim with prejudice, and entered judgment in favor of all defendants.[7]

The Court of Appeal reversed the judgment. Based on principles of collateral estoppel, it first held that the federal judgment precludes plaintiffs from recovering on the theory that the officers failed to exercise reasonable care in using deadly force, explaining that "[w]hether the officers acted with reasonable care is precisely the issue resolved by the federal jury and the trial court when each specifically concluded from the perspective of a reasonable officer on the scene, taking into account the facts and circumstances confronting them, the officers' conduct was objectively reasonable." It then held, however, that plaintiffs could proceed on the theory that the officers failed to use reasonable care in creating, through their preshooting conduct, a situation in which it was reasonable for them to use deadly force. The court reasoned that neither the jury's special verdict nor the federal court's posttrial ruling regarding Sanchez addressed this issue. After expressing "doubt" that plaintiffs' complaint adequately alleged a preseizure negligence theory of liability,

---

[7] Plaintiffs' state court complaint identified Padilla as a defendant. However, because of plaintiffs' stated intent to dismiss Padilla, the trial court limited its ruling on the demurrer to the other officers and Pomona. The parties subsequently disposed of the claim against Padilla by stipulation and the trial court, based on that stipulation, ordered entry of final judgment in favor of all defendants, including Padilla. The Court of Appeal's opinion did not mention Padilla, and stated that the only individual defendants are "the four officers involved in the shooting." It thus appears that Padilla is no longer a party to these proceedings.

the Court of Appeal reversed the trial court's judgment and remanded the cause to permit plaintiffs to file an amended complaint alleging that theory.[8]

We then granted defendants' petition for review.

## DISCUSSION

■ "Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings. [Citation.] Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.]" (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223], fn. omitted (*Lucido*).)

Of these elements, the only one here in dispute is the first: whether the issues as to which defendants assert preclusion are identical to issues decided in the earlier federal court proceeding involving plaintiffs' section 1983 claim. As previously noted, the Court of Appeal found this requirement satisfied insofar as plaintiffs now allege that the officers failed to exercise reasonable care in using deadly force, but not insofar as plaintiffs might allege that the officers failed to exercise reasonable care in creating, through their preshooting conduct, a situation in which it was reasonable for them to use deadly force. Plaintiffs challenge the former finding and defendants challenge the latter.

■ For purposes of collateral estoppel, an issue was actually litigated in a prior proceeding if it was properly raised, submitted for determination, and determined in that proceeding. (*People v. Sims* (1982) 32 Cal.3d 468, 484 [186 Cal.Rptr. 77, 651 P.2d 321].) In considering whether these criteria have been met, courts look carefully at the entire record from the prior proceeding, including the pleadings, the evidence, the jury instructions, and any special jury findings or verdicts. (*Turner v. Arkansas* (1972) 407 U.S. 366, 368–369 [32 L.Ed.2d 798, 92 S.Ct. 2096]; *Clark v. Lesher* (1956) 46 Cal.2d 874, 880–881 [299 P.2d 865]; *Murphy v. Murphy* (2008) 164 Cal.App.4th 376, 400–401 [78 Cal.Rptr.3d 784]; *U.S. v. Cala* (2d Cir. 1975) 521 F.2d 605, 607–608; *In re Henicheck* (Bankr. E.D.Va. 1995) 186 B.R. 211, 215.) "The

---

[8] Before discussing issue preclusion, the Court of Appeal considered whether principles of claim preclusion bar plaintiffs' claim. In light of our conclusion, we need not consider that question.

'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same. [Citation.]" (*Lucido, supra*, 51 Cal.3d at p. 342.)

1. *Whether the Officers Used Reasonable Care in Using Deadly Force.*

The record here demonstrates that in plaintiffs' federal action, the issue of whether the officers exercised reasonable care in using deadly force was raised, submitted for decision, and actually decided against plaintiffs in resolving their section 1983 claim. The section 1983 claim in plaintiffs' federal court complaint alleged in part that the officers "shot and killed" Hernandez "without reasonable cause," and that the shooting was "unreasonable" and "entirely unjustified by" Hernandez's "actions." During the federal trial, the officers testified at length about the circumstances leading up to and surrounding the shooting. In relevant part, the jury instructions regarding the section 1983 claim stated the following: (1) "[a] law enforcement officer has the right to use such force as is reasonably necessary under the circumstances to make a lawful arrest," and "[a]n unreasonable seizure occurs when a law enforcement officer uses excessive force in making a lawful arrest"; (2) "[t]he use of deadly force is only justified when a reasonable law enforcement officer would reasonably believe that there was an immediate threat to the safety of the officer or others at the time the force was used"; (3) "[w]hether force is reasonably necessary or excessive is measured by the force a reasonable and prudent law enforcement officer would use under the circumstances"; (4) "[t]he reasonableness inquiry . . . is an objective one," and "[t]he reasonableness of the use of force should be judged" "in light of the facts and circumstances confronting" the police "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"; (5) "[s]ome of the things you may want to consider in determining whether the defendant used excessive force are the severity of the crime at issue, whether the plaintiff posed a reasonable threat to the safety of the officer or others, and whether the plaintiff was actively resisting detention or attempting to escape"; and (6) "[i]n deciding whether excessive force was used, you should consider the totality of the circumstances at the time." As noted above, based on these instructions, the jury, by special verdict, found that Cooper, Devee and Luna had not "violate[d]" Hernandez's "Fourth and Fourteenth Amendment rights by using excessive force against him." As also noted above, in later granting Sanchez's posttrial motion for judgment, the federal court found that Sanchez's "use of deadly force was reasonable under the circumstances," because he "found himself in a situation that he reasonably believed would threaten his life if he did not act immediately."

In the wrongful death claim now at issue, plaintiffs allege that the officers acted "without due care," "cause or provocation" in killing Hernandez, that "[t]he shooting . . . occurred as a result of the absence of due care for the safety of others and constituted an unreasonable, unwarranted, and excessive use of force," and that the officers "unreasonably and unjustifiably killed . . . Hernandez without cause or provocation." On this record, the Court of Appeal correctly concluded that with respect to the actual shooting, the negligence issue in plaintiffs' wrongful death claim—"whether the officers acted with reasonable care" in shooting Hernandez—"is precisely the issue resolved [against plaintiffs] by the federal jury and the trial court when each specifically concluded from the perspective of a reasonable officer on the scene, taking into account the facts and circumstances confronting them, the officers' conduct was objectively reasonable."

In arguing otherwise, plaintiffs assert that the standard of reasonableness applicable in a section 1983 action based on excessive force "is not the same" as the standard of reasonableness applicable in a negligence action under California law. According to plaintiffs, the Fourth Amendment standard "focuses the analysis on balancing the concerns of the government with the extent of the intrusion," whereas the California standard involves no such balancing and "focuses" only "on the reasonably prudent person." Moreover, plaintiffs assert, quoting *Harris v. Grimes* (2002) 104 Cal.App.4th 180 [127 Cal.Rptr.2d 791] (*Harris*), *Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th 277 [54 Cal.Rptr.2d 655] (*Lucas*), and *Mattson v. City of Costa Mesa* (1980) 106 Cal.App.3d 441 [164 Cal.Rptr. 913] (*Mattson*), reasonableness under section 1983 and reasonableness under state negligence law " 'are not the same' " in that a section 1983 violation requires " 'a state of mind more blameworthy' " than that required for negligence; " '[t]o be entitled to relief under section 1983, [a] plaintiff must . . . show intentional conduct in circumstances in which the offending governmental employees were legally bound to know that their conduct would deprive the plaintiff of civil rights.' "

■ Plaintiffs' arguments are unpersuasive. Contrary to plaintiffs' assertion, the United States Supreme Court has never suggested that a fact finder, in determining whether a particular seizure was reasonable, should conduct a balancing of governmental and private interests. Instead, the high court has itself conducted this balancing in (1) concluding that police may not "use . . . deadly force to prevent the escape of all felony suspects, whatever the circumstances," (2) announcing the applicable standard of reasonableness, i.e., whether police had probable cause to believe the suspect posed a threat of serious physical harm to themselves or to others, and (3) enumerating *the factors* that must be considered in determining whether a challenged seizure was reasonable. (*Tennessee v. Garner* (1985) 471 U.S. 1, 11–12 [85 L.Ed.2d 1,

105 S.Ct. 1694]; see also *Scott v. Harris* (2007) 550 U.S. 372 [167 L.Ed.2d 686, 127 S.Ct. 1769, 1778–1779]; *Graham v. Connor* (1989) 490 U.S. 386, 396–397 [104 L.Ed.2d 443, 109 S.Ct. 1865] (*Graham*).) Consistent with these principles and the factors the high court has identified, the federal court in this case did *not* instruct the jury to conduct some abstract or nebulous balancing of competing interests. Instead, as noted above, it instructed the jury to determine the reasonableness of the officers' actions in light of "the totality of the circumstances at the time," including "the severity of the crime at issue, whether the plaintiff posed a reasonable threat to the safety of the officer or others, and whether the plaintiff was actively resisting detention or attempting to escape." The same consideration of the totality of the circumstances is required in determining reasonableness under California negligence law. (See *Commercial U. A. Co. v. Pacific G. & E. Co.* (1934) 220 Cal. 515, 522 [31 P.2d 793] [jury's "duty" in a negligence action is to "determin[e] whether under all the facts and surrounding circumstances," the conduct in question "was that of persons of ordinary prudence and discretion"].) Moreover, California's civil jury instructions specifically direct the jury, in determining whether police officers used unreasonable force for purposes of tort liability, to consider the same factors that the high court has identified and that the federal court's instructions in this case set forth. (Judicial Council of Cal. Civ. Jury Instns. (2008) CACI No. 1305.) Thus, plaintiffs err in arguing that the federal and state standards of reasonableness differ in that the former involves a fact finder's balancing of competing interests.

■ Plaintiffs' effort to differentiate the two standards also fails insofar as it rests on an asserted difference between the requisite mental states. As to plaintiffs' section 1983 action, the federal court's instructions explained that the standard of reasonableness is "an objective one" and directed the jury to determine the reasonableness of the officers' actions "objectively" and "without regard to their underlying intent or motivation." These instructions were consistent with binding high court precedent, which states: "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, *without regard to their underlying intent or motivation.* [Citations.] An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. [Citation.]" (*Graham, supra,* 490 U.S. at p. 397, italics added.) On this record, plaintiffs are incorrect in asserting that, because the reasonableness standard at issue in the section 1983 action involved " 'a

state of mind more blameworthy' " than the reasonableness standard under California negligence law, issue preclusion does not apply.[9]

The decisions plaintiffs cite—*Lucas, Mattson,* and *Harris*—do not require a different conclusion. The court in *Lucas* did not, as plaintiffs assert, broadly hold that "[r]easonable conduct under a [federal] civil rights violation is different from a negligence action because a civil rights violation 'describes a state of mind more blameworthy.' " Rather, the *Lucas* court reached the far narrower conclusion that *the particular constitutional violation there alleged* as the basis for the section 1983 claim—failing to render medical care to an inmate—required proof of "deliberate indifference," and that "this standard . . . describes a state of mind more blameworthy" than "[m]ere negligence." (*Lucas, supra,* 47 Cal.App.4th at p. 287.) The constitutional violation plaintiffs alleged here in their section 1983 claim was different and involved a standard of reasonableness, not deliberate indifference.

In *Mattson,* which involved an excessive force claim, the court, in holding that a prior federal judgment did not have preclusive effect as to "the issues of lack of probable cause and excessive force," reasoned: "From the record before us it appears possible that the federal jury determined no more than that defendants . . . lacked the requisite mens rea." (*Mattson, supra,* 106 Cal.App.3d at pp. 445–446.) The record before us does not leave open this possibility because, as explained above, the federal court followed high court precedent and instructed the jury to determine reasonableness "without regard to [the officers'] underlying intent or motivation."[10]

---

[9] It is true that there may be liability under section 1983 only if the acts constituting the seizure were "willful" in the sense that they were not "unknowing" or "accidental." (*Brower v. County of Inyo* (1989) 489 U.S. 593, 596 [103 L.Ed.2d 628, 109 S.Ct. 1378] (*Brower*).) In other words, "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control" (*ibid.*), i.e., "a governmental termination of freedom of movement through means intentionally applied" (*id.* at p. 597, italics omitted). Consistent with these principles, the federal court here instructed the jury that it was plaintiffs' burden to prove, among other things, that "the acts or omissions of the defendant[s] were intentional." In the federal action, plaintiffs never alleged or argued that the officers' acts were not intentional or willful in this sense. On the contrary, in their section 1983 claim, they alleged that the shooting was "willful." Nothing indicates there was any evidence presented in the federal trial to suggest that the shooting was accidental. And, in granting Sanchez's posttrial motion for judgment, the federal court expressly found that Sanchez fired because he saw Hernandez reaching toward his waistband and yelling either "I got a gun" or "Gun," and the other officers fired because they heard the shots as they approached and assumed Sanchez was involved in a gun battle with Hernandez. Thus, the federal judgment clearly rested on findings that the officers acted reasonably, not on findings that they fired unknowingly or accidentally.

[10] Because the *Mattson* court, applying claim preclusion principles, held that an earlier federal judgment barred the plaintiff's state law claims (*Mattson, supra,* 106 Cal.App.3d at pp. 446–456), its discussion of issue preclusion, including the "mens rea" required for recovery under section 1983, was dictum. Moreover, in its opinion, the court nowhere mentioned the jury instructions in the federal case or otherwise identified the legal principles the federal court

In *Harris*, which also involved an excessive force claim, the court declined to apply collateral estoppel as to the issue of reasonableness, reasoning that because the plaintiff asserted the officer had accidentally fired his gun and "the federal jury rendered a general verdict [against the plaintiff] without any special findings," "the jury could have reached its verdict for any number of reasons other than finding the shooting was a reasonable use of force." (*Harris, supra*, 104 Cal.App.4th at p. 187.) Here, plaintiffs do not claim, and there is no evidence, that the officers fired accidentally, and the instructions and special verdict foreclose the possibility that the jury reached its verdict for reasons other than the reasonableness of the officers' actions. Because of these distinctions, *Lucas*, *Mattson*, and *Harris* are inapposite.[11] We therefore

---

actually instructed the jury to apply. Instead, it appears to have based its "mens rea" standard on an abstract reading of case law. (*Mattson, supra*, 106 Cal.App.3d at p. 446.) In setting forth that standard—"intentional conduct in circumstances in which the [police] were legally bound to know that their conduct would deprive the plaintiff of civil rights" (*ibid.*)—the court seemingly combined two distinct inquiries relevant to recovery: (1) whether a constitutional violation occurred, because the force used was not objectively reasonable; and (2) whether the officer, though committing a constitutional violation by using excessive force, is nevertheless immune from liability. (See *Saucier, supra*, 533 U.S. at pp. 202–206.) As already explained, regarding the first inquiry—reasonableness—although an officer's actions must have been intentional in the sense they were not "unknowing" or "accidental" (*Brower, supra*, 489 U.S. at p. 596), the officer's underlying intent and motivation are not determinative (*Saucier, supra*, 533 U.S. at p. 210). The second inquiry—immunity—focuses directly on whether the police were, to quote *Mattson*, "legally bound to know that their conduct would deprive the plaintiff of civil rights." (*Mattson, supra*, at p. 446; see *Saucier, supra*, 533 U.S. at p. 202 [officer immune unless "the law . . . put [him] on notice that his conduct would be clearly unlawful," i.e., "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"].) The record here demonstrates that the federal jury was not asked to consider immunity, and that its verdict rested only on a finding of reasonableness. Regarding Sanchez, in granting his posttrial motion for judgment, the trial court expressly addressed both issues, first finding that no constitutional violation occurred because Sanchez's conduct was objectively reasonable, and then finding alternatively that even assuming a violation, Sanchez was immune because he did not "knowingly violate the law" and he "reasonably could have believed that his conduct was lawful under the circumstances." As previously noted, at the time of the federal proceedings, high court precedent required the federal court to determine whether there was a constitutional violation *before* determining the immunity question. (*Saucier, supra*, at pp. 200–201.)

[11] As a second reason for refusing to apply collateral estoppel, the *Harris* court, citing only *Lucas* and *Mattson*, stated that reasonableness "in civil rights law does not always mean reasonable conduct under negligence law. The two concepts are not the same. [Citations.]" (*Harris, supra*, 104 Cal.App.4th at p. 187.) As already explained, *Lucas* compared the reasonableness standard under state negligence law to the "deliberate indifference" standard applicable to constitutional claims based on a failure to render medical care to an inmate, not to the reasonableness standard applicable to Fourth Amendment excessive force claims. (*Lucas, supra*, 47 Cal.App.4th at pp. 287–288.) As also already explained, *Mattson* is illuminating regarding reasonableness, as opposed to immunity, only insofar as it indicates that the officer's conduct must be intentional, as opposed to accidental or unknowing.

agree with the Court of Appeal that the federal proceedings collaterally estop plaintiffs from recovering on the theory that the officers acted negligently in using deadly force.

### 2. *Negligence Liability for the Officers' Preshooting Conduct.*

As noted above, although applying collateral estoppel to the issue of the officers' alleged negligence in using deadly force, the Court of Appeal held that plaintiffs could pursue a negligence claim "on the theory that [the officers'] conduct leading up to the shooting, including the high-speed pursuit, foot chase, and release of a pursuit dog created an unreasonable risk of harm to themselves and Hernandez." It reasoned that "neither the jury's special verdict nor the trial court's [posttrial] finding [regarding Sanchez] addressed the question whether the officers were negligent in *creating* a situation in which it was reasonable for them to use deadly force."

Plaintiffs agree with the Court of Appeal, arguing (1) evidence that the officers acted negligently in their conduct leading up to the shooting was not relevant to the determination in the federal proceeding that the shooting was reasonable, and (2) the officers' alleged preshooting negligence was not adjudicated in the federal proceedings. Defendants, of course, argue otherwise; they contend that, because the federal court and jury applied a totality-of-circumstances test, their findings that the use of deadly force was reasonable "necessarily" included the officers' preshooting conduct. In other words, defendants claim, the federal court and jury found that the officers "acted reasonably from the initial contact with" Hernandez "through the ultimate use of deadly force." Defendants also argue that, under California statutes and case law, there is no separate "negligence-type" duty arising from tactical decisions leading up to the use of force and a peace officer's objectively reasonable use of force is a bar to tort liability.

Based on the record, we cannot agree with defendants' claim that the federal court and jury made a finding as to the reasonableness of all of the officers' preshooting conduct. Although the federal court broadly instructed the jury to consider the totality of the circumstances—and thus, the jury necessarily considered *the evidence* regarding the officers' preshooting conduct—the court also instructed that plaintiffs' claim involved "deadly force" and that "[t]he use of deadly force is only justified when a reasonable law enforcement officer would reasonably believe that there was an immediate threat to the safety of the officer or others at the time the force was used." Based on this instruction, the jury's finding that the officers (other than Sanchez) did not violate Hernandez's Fourth Amendment rights by using excessive force implies no more than a finding that the shooting itself was reasonable because, under the circumstances, the officers reasonably believed

Hernandez presented an immediate threat to either their own or someone else's safety. Likewise, in granting Sanchez's posttrial motion, the federal court found only that his use of deadly force was reasonable because he had an objectively reasonable belief Hernandez posed a threat of serious harm. Thus, as the Court of Appeal correctly held, neither the jury nor the federal court made a finding as to whether all of the officers preshooting conduct was itself independently reasonable, i.e., not negligent.[12]

■ Nevertheless, we agree with defendants that, in light of the finding that the shooting was reasonable, liability in this case may not be based on the officers' alleged preshooting negligence. The starting point for our conclusion is the validity of the initial detention. Based on the conceded fact that the Thunderbird was being illegally operated at night without lights (Veh. Code, §§ 280, 24250, 24400), Officer Cooper was legally justified in attempting to detain both of the car's occupants and asking them to exit the car. (See *Whren v. United States* (1996) 517 U.S. 806, 819 [135 L.Ed.2d 89, 116 S.Ct. 1769] [car stop is reasonable where officers have probable cause to believe driver violated the vehicle code]; *People v. Hoyos* (2007) 41 Cal.4th 872, 892 [63 Cal.Rptr.3d 1, 162 P.3d 528] ["officer making a traffic stop may, without violating the Fourth Amendment, order the driver and passengers to exit a car"].) When Hernandez, in response to Cooper's request that he exit the car, moved into the driver's seat and drove off with the headlights unilluminated, Cooper had reasonable cause to believe Hernandez had committed two public offenses: (1) driving during darkness without lighted headlamps (Veh. Code, §§ 280, 24250, 24400); and (2) willfully resisting, delaying, or obstructing a peace officer "in the discharge or attempt to discharge any duty of his or her office" (Pen. Code, § 148, subd. (a)(1); see *People v. Allen* (1980) 109 Cal.App.3d 981, 985–987 [167 Cal.Rptr. 502]).

■ Because Cooper had probable cause to arrest Hernandez, under both statutes and case law, Cooper was not obliged simply to let Hernandez go. Long ago, we explained that an officer with probable cause to make an arrest " ' "is not bound to put off the arrest until a more favorable time" ' " and is " 'under no obligation to retire in order to avoid a conflict.' " (*People v. Hardwick* (1928) 204 Cal. 582, 587 [269 P. 427] (*Hardwick*).) Instead, an officer may " 'press forward and make the arrest, using all the force [reasonably] necessary to accomplish that purpose.' " (*Id.* at p. 588; see also *Hooper v. City of Chula Vista* (1989) 212 Cal.App.3d 442, 453 [260 Cal.Rptr.

---

[12] Moreover, given the law as declared by the Ninth Circuit Court of Appeals, which governed in the federal trial, any such finding would have been unnecessary to deciding plaintiffs' section 1983 claim. Under Ninth Circuit law, if an officer's use of deadly force is reasonable in light of the circumstances confronting the officer at the time of the shooting, liability under section 1983 may not be based on a finding that the officer negligently created a situation in which it was reasonable to use deadly force. (*Billington v. Smith* (9th Cir. 2002) 292 F.3d 1177, 1190.)

495] ["police officer has a duty to the community to carry out his or her obligation to promote law-abiding, orderly conduct, including, where necessary, to detain and arrest suspected perpetrators of offenses"].) Consistent with these principles, Penal Code section 835a provides that a peace officer with reasonable cause to make an arrest "may use reasonable force to effect the arrest" and "need not retreat or desist from his efforts [to make an arrest] by reason of the resistance or threatened resistance of the person being arrested." Thus, California law expressly authorized Cooper to pursue Hernandez and to use reasonable force to make an arrest.

Indeed, in their brief, plaintiffs concede that they may not base negligence liability on the officers' *decision* to engage in the pursuit.[13] They argue, however, that they may base liability on the officer's subsequent execution of their decision, i.e., the actual *"operation"* of the pursuit, "including the use of high-speed automobile maneuvering."

■ However, on the conceded facts here, California law provides otherwise. Under Vehicle Code section 17004, *the individual officers* may not be held civilly liable for Hernandez's death based on the manner in which they operated their vehicles during the chase, even assuming they acted without due care.[14] (See *Cruz v. Briseno* (2000) 22 Cal.4th 568, 572–573 [93 Cal.Rptr.2d 715, 994 P.2d 986].) ■ Under Government Code section 815.2, subdivision (b), because the individual officers are immune, Pomona, as their employer, is also immune unless some statute provides otherwise.[15] In *Brummett v. County of Sacramento* (1978) 21 Cal.3d 880, 883–886 [148 Cal.Rptr. 361, 582 P.2d 952], we held that, with respect to police vehicular chases, an exception to the general rule of a public employer's derivative immunity exists under Vehicle Code section 17001, which provides: "A public entity is liable for death or injury to person . . . proximately caused by

---

[13] Plaintiffs base their concession on Government Code section 820.2, which states: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Plaintiffs' concession is consistent with a long line of Court of Appeal decisions. (E.g., *City of Sacramento v. Superior Court* (1982) 131 Cal.App.3d 395, 404 [182 Cal.Rptr. 443]; *Gibson v. City of Pasadena* (1978) 83 Cal.App.3d 651, 661 [148 Cal.Rptr. 68]; *Sparks v. City of Compton* (1976) 64 Cal.App.3d 592, 596 [134 Cal.Rptr. 684]; *Bratt v. City and County of San Francisco* (1975) 50 Cal.App.3d 550, 553 [123 Cal.Rptr. 774].) We have never ruled on the question, and find it unnecessary to do so here.

[14] In relevant part, Vehicle Code section 17004 provides that "[a] public employee is not liable for civil damages on account of personal injury to or death of any person . . . resulting from the operation, in the line of duty, of an authorized emergency vehicle . . . when in the immediate pursuit of an actual or suspected violator of the law . . . ."

[15] Government Code section 815.2, subdivision (b), states in full: "Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

a negligent or wrongful act or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of his employment." However, as a matter of law, this section is inapplicable on the conceded facts here, because Hernandez's death was not caused by a negligent or wrongful act "in the operation of [a] motor vehicle" (*ibid.*) as we have construed that phrase. To meet this statutory requirement, "it is not sufficient that a motor vehicle somehow be involved in the series of events that results in the injury." (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 923 [50 Cal.Rptr.2d 309, 911 P.2d 496].) Instead, "the vehicle must be in a 'state of being at work' or 'in the . . . exercise of some specific function' by performing work or producing effects *at the time and place the injury is inflicted.*" (*Chilcote v. San Bernardino County* (1933) 218 Cal. 444, 445 [23 P.2d 748], italics added [construing predecessor of Veh. Code, § 17001, Civ. Code, former § 1714 1/2].) As a matter of law, that statutory requirement has not been met in the case now before us, because the conceded facts are that the shooting occurred well *after* the police stopped and exited their cars and chased Hernandez on foot. Accordingly, neither the individual officers nor Pomona may be held civilly liable for Hernandez's death based on the manner in which the officers conducted the vehicular pursuit.

Insofar as plaintiffs rely on the officers' conduct during the foot pursuit, plaintiffs have not demonstrated that, notwithstanding the findings in federal court, they can amend their complaint to state a negligence claim.[16] During oral argument, in explaining the basis for the preshooting negligence claim, plaintiffs' counsel placed primary emphasis on the following circumstances: (1) Cooper, without seeing a weapon, screamed that Hernandez had a gun and told Sanchez to shoot Hernandez; and (2) according to one witness, Hernandez raised up his shirt to expose his waistline and yelled to Cooper that he was unarmed. However, the federal jury's verdict in Cooper's favor collaterally estops plaintiffs from pursuing this theory of negligence. The jurors who returned that verdict knew of these circumstances and nevertheless necessarily found (given the jury instructions) that, in light of the facts known to Cooper, his belief that Hernandez posed an immediate threat to safety was reasonable. Given this finding, plaintiffs are estopped from premising negligence liability on the theory that Cooper's belief was unreasonable.

Nor may plaintiffs base negligence liability on the preshooting acts they identify in their brief: "chasing [Hernandez] into a darkened parking lot" and "the use and release of a vicious dog." Regarding the former, it was, of

---

[16] Where a complaint's allegations are insufficient as a matter of law, the burden of proving a reasonable possibility that an amendment can cure the defect "is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Thus, plaintiffs must identify some legal theory or state of facts they wish to add by way of amendment that would change the legal effect of their pleading. (*HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 513, fn. 3 [125 Cal.Rptr. 365, 542 P.2d 237].)

course, Hernandez, as part of his illegal flight from the officers, who chose where to run; the officers merely followed his chosen path of attempted escape. As we have already explained, the officers were not obliged simply to let Hernandez go; they were authorized to press forward in an attempt to make an arrest, using reasonably necessary force. (*Hardwick, supra*, 204 Cal. at p. 587; Pen. Code, § 835a.) Plaintiffs therefore may not premise negligence liability on the fact that the officers followed Hernandez as he ran into a darkened parking lot.

█ Regarding the use and release of a police dog, given the conceded facts here, we find no basis for negligence liability as a matter of law. Those conceded facts are that Officer Luna, in the K-9 unit, participated in the vehicle pursuit as Hernandez led the officers on the high-speed chase, and released the dog during the subsequent foot pursuit only in response to Cooper's report that Hernandez had brandished a firearm. In other words, when Luna released the dog, he had personal knowledge that Hernandez was determined to escape, he had personal knowledge that Hernandez was willing to endanger his own life and the lives of the officers and the public in order to achieve this end, and he had reason to believe that Hernandez was threatening the officers with a firearm. On these conceded facts, no reasonable juror could find that Luna acted unreasonably in releasing the dog. (Cf. *People v. Rivera* (1992) 8 Cal.App.4th 1000, 1007–1008 [10 Cal.Rptr.2d 785] (*Rivera*) [release and use of police dog reasonable where officer knew suspect was fleeing and, based on report that suspect was armed, reasonably feared for his safety].) Therefore, as a matter of law, Luna was not negligent in releasing the dog.[17] (Cf. *Gray v. Brinkerhoff* (1953) 41 Cal.2d 180, 183 [258 P.2d 834] [question of defendant's negligence may be determined as a matter of law where reasonable jurors "can draw but one conclusion from the evidence presented"].) Thus, on the conceded facts here, we find no basis for a preshooting negligence claim.[18]

---

[17] Plaintiffs identify nothing in the use, as opposed to the release, of the dog they claim was negligent. There was testimony during the federal trial that Luna made an announcement about his release of the dog. Plaintiffs have neither pointed to contrary evidence in the record from the federal trial nor asserted otherwise, and as already noted, their counsel stated during oral argument that the evidence that would be introduced at the trial plaintiffs now seek would be the same as the evidence introduced at the federal trial. In any event, given the conceded facts here, as set forth above, our conclusion would be the same even if Luna did not make an announcement. (Cf. *Rivera, supra*, 8 Cal.App.4th at pp. 1004–1008 [release and use of dog were reasonable notwithstanding officer's decision, based on his belief the suspect was armed and his consequent desire to have the element of surprise, not to make an announcement].)

[18] In light of our analysis and conclusion, we do not address defendants' claims that they owed no duty of care regarding their preshooting conduct and that they are immune under Penal Code section 196. We also do not consider the other immunity statutes discussed by amici curiae.

According to Justice Moreno's concurring opinion, to reject plaintiffs' preshooting negligence argument, we should say no more than that "plaintiffs have not shown in this court how

**DISPOSITION**

 For the reasons stated above, we hold that the trial court did not err in entering judgment for defendants. We therefore reverse the Court of Appeal's judgment and remand the matter with directions to reinstate the trial court's judgment.

George, C. J., Kennard, J., Baxter, J., and Corrigan, J., concurred.

**MORENO J.,** Concurring.—I agree with the majority that the Court of Appeal was correct that the federal judgment precluded plaintiffs from relitigating in the present state action whether defendants were negligent in their use of deadly force. Accordingly, I concur in part 1. of the majority opinion. (Maj. opn., *ante*, at pp. 512–517.)

I disagree with the Court of Appeal's conclusion that this does not resolve the case because plaintiffs are entitled to amend their complaint to allege preshooting negligence. " 'Where the complaint is defective, "[i]n the further-ance of justice great liberality should be exercised in permitting a plaintiff to amend his complaint, and it ordinarily constitutes an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment. [Citations.]" ' [Citations.] This abuse of discretion is reviewable on appeal 'even in the absence of a request for leave to amend' [citation], and even if the plaintiff does not claim on appeal that the trial court abused its discretion in sustaining a demurrer without leave to amend. [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 970–971 [9 Cal.Rptr.2d 92, 831 P.2d 317].) "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) " 'Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading. [Citation.]' [Citation.]" (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].)

Plaintiffs did not attempt to amend their complaint in the superior court to allege preshooting negligence. The superior court in the present case did not

they would amend the complaint to allege preshooting negligence." (Conc. opn. of Moreno, J., *post*, at p. 523.) However, as already explained, plaintiffs assert in their brief that the officers were negligent in "the use of high speed automobile maneuvering," in "the use and release of a vicious dog," and in "chasing [Hernandez] into a darkened parking lot," and plaintiffs' counsel asserted during oral argument that Officer Cooper was negligent in screaming that Hernandez had a gun and telling Officer Sanchez to shoot Hernandez even though Cooper never saw a weapon. On this record, unlike Justice Moreno, we find that plaintiffs have adequately shown how they would amend their complaint to allege a preshooting negligence claim, and that we must determine whether any of the preshooting acts plaintiffs have identified can support negligence liability.

sustain the demurrer without leave to amend. The superior court held that the federal court judgment precluded plaintiffs from relitigating in state court whether defendants' use of deadly force was reasonable, but overruled the demurrer because it concluded the federal judgment did not preclude plaintiffs from recovering on the theory that defendants failed to summon medical aid and prevented such aid from being administered. Rather than seek to amend their complaint to allege preshooting negligence, plaintiffs asked the superior court to strike their allegations regarding medical aid and enter a final judgment in favor of defendants.

The Court of Appeal initially concluded that plaintiffs' allegation in their complaint in the present case that " '[t]he shooting of [Hernandez] occurred as a result of the absence of due care for the safety of others' " "is sufficient to plead negligence on the part of the officers based on the theory their conduct leading up to the shooting, including the high-speed pursuit, foot chase, and release of a pursuit dog created an unreasonable risk of harm to themselves and Hernandez." But the Court of Appeal later stated that it had "some doubt the plaintiffs' complaint adequately pleads their pre-seizure negligence theory" and concluded "the appropriate disposition is to . . . remand the cause to permit the plaintiffs to file a 'clean' amended complaint alleging negligence based on their pre-seizure theory."

The allegation in plaintiffs' complaint that " '[t]he shooting of [Hernandez] occurred as a result of the absence of due care for the safety of others' " cannot reasonably be read to allege that defendants engaged in preshooting negligence. Plaintiffs, therefore, never have alleged that defendants' conduct prior to the shooting negligently created a situation in which it was reasonable to use deadly force. Despite the Court of Appeal's invitation to amend the complaint to do so, plaintiffs have not shown in this court how they would amend the complaint to allege preshooting negligence. Accordingly, plaintiffs have not met their burden of proving that it is reasonably possible that they can amend their complaint to allege a cause of action for preshooting negligence.

In my view, we need say no more to resolve this case. We can and should wait for a case in which the plaintiff actually has alleged a cause of action for preshooting negligence to consider that cause of action.

Werdegar, J., concurred.

**CORRIGAN, J.,** Concurring.—I concur, but write separately to express misgivings about the path the litigation has taken in this case. I agree that plaintiffs' state claims here are foreclosed by a combination of issue preclusion and the application of law to conceded facts. However, I do not believe

that defendants and state courts should be required to relitigate the facts and parse the federal record for precluded issues in every case where a federal court retains supplemental jurisdiction of state claims, then dismisses them after trying a claim under 42 United States Code section 1983 (section 1983). In such cases, litigation in state court should be barred by principles of claim preclusion, for reasons well stated by Justice Kaufman in *Mattson v. City of Costa Mesa* (1980) 106 Cal.App.3d 441 [164 Cal.Rptr. 913] (*Mattson*), another case involving claims under both state tort law and section 1983:

"Once it is known that the federal court will not exercise pendent jurisdiction over the state claim, plaintiff's proceeding to trial in the federal court on the federal claim alone will necessarily result in splitting the plaintiff's cause of action, and that fact should be apparent to the plaintiff.

"In such circumstances the rule that would best accommodate the rights of the plaintiff to fully litigate his claim and to invoke the jurisdiction of the federal court and the right of the defendant, the courts and the public to be free of multiple litigation of the same cause of action, is that once the federal court has declined to exercise pendent jurisdiction over the state claim, if the plaintiff then elects to proceed to trial and judgment in the federal court, his entire cause of action is either merged in or barred by the federal court judgment so that he may not thereafter maintain a second suit on the same cause of action in a state court.

"A contrary rule would invite manipulation. It would permit a plaintiff halfheartedly to request the federal court to exercise pendent jurisdiction, offer little resistance to any argument by the defendant against its exercise, and hope that the federal court would decline to exercise pendent jurisdiction and thereby reserve to the plaintiff a second chance to prevail in a state court action should he be [un]successful in the federal court. Judicious utilization of judicial and litigant resources become[s] ever more essential in the wake of the law explosion. The efficient administration of justice would not be advanced by a rule resulting in or encouraging multiple litigation of a single cause of action." (*Mattson, supra*, 106 Cal.App.3d at p. 455.)

*Mattson* is not precisely on point, because there the federal court had refused to exercise pendent jurisdiction over the plaintiff's state claim, whereas here the court retained jurisdiction and dismissed the state claims only after plaintiffs were unsuccessful at trial.[1] However, once the federal court bifurcated the state claims and limited the scope of trial to the section 1983 claim, plaintiffs were in essentially the same position as the plaintiff in

---

[1] In 1990, after *Mattson* was decided, Congress codified the judicial doctrines of pendent and ancillary jurisdiction, under the name "supplemental jurisdiction." (28 U.S.C. § 1367; see 2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction, § 73, p. 639.)

*Mattson.* The chances that the court would take up the state claims, once it decided not to present them to the jury, were slim to none. Furthermore, as noted in *Mattson*, if their state claims are preserved, plaintiffs have no reason to press for resolution of those claims in the federal action, because they are permitted to relitigate the underlying facts in state court. (*Mattson, supra,* 106 Cal.App.3d at p. 455.)

The Court of Appeal in this case relied on *Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th 277 [54 Cal.Rptr.2d 655] (*Lucas*), and *Harris v. Grimes* (2002) 104 Cal.App.4th 180 [127 Cal.Rptr.2d 791] (*Harris*), to hold that claim preclusion does not apply when a federal court waits until after entering judgment on the federal claim to dismiss a state claim. *Lucas*, however, was a very different case. There, the federal court dismissed the state claims after granting summary judgment on the section 1983 claims. (*Lucas*, at p. 283; for a similar case, see *Craig v. County of Los Angeles* (1990) 221 Cal.App.3d 1294, 1298 [271 Cal.Rptr. 82] (*Craig*).)[2] There was, evidently, no severance or bifurcation, and certainly there was no election by the plaintiffs to proceed to trial on their federal claims alone, as in this case and in *Mattson*.

*Harris* was a malpractice action arising from counsel's failure to timely litigate state law claims that were dismissed after a federal trial of the plaintiff's section 1983 claim. The *Harris* court disagreed with *Mattson* and followed *Lucas*. Noting what it deemed to be controlling principles from the Restatement Second of Judgments, the court reasoned that there was no concern about multiple litigation in the case before it. (*Harris, supra,* 104 Cal.App.4th at pp. 188–189.) *Harris* is unpersuasive. *Lucas* is materially distinguishable, as noted above. The *Mattson* court carefully considered the applicable Restatement principles, and its reasoning was sound. (*Mattson, supra,* 106 Cal.App.3d at pp. 450–453, discussing Rest., Judgments, §§ 61, 61.1 & 67, and comments; see Rest.2d Judgments, § 26, com. d, p. 238, § 24, com. g, p. 204 & § 25, com. e, p. 213.) While malpractice may have foreclosed multiple litigation in *Harris*, that peculiarity provides no support for the court's claim preclusion analysis.

---

[2] The *Lucas* and *Craig* courts followed the reasoning of *Merry v. Coast Community College Dist.* (1979) 97 Cal.App.3d 214 [158 Cal.Rptr. 603], another case involving refusal to exercise pendent jurisdiction over state claims following *pretrial* dismissal of federal claims. (*Lucas, supra,* 47 Cal.App.4th at p. 286; *Craig, supra,* 221 Cal.App.3d at pp. 1299–1300; *Merry*, at p. 228.) *Merry* was decided by the same court as *Mattson*. In *Mattson*, the court noted that *Merry* was not controlling when a plaintiff takes a cause of action to trial on a federal theory alone, because (1) "the decision in *Merry* was greatly influenced by the summary nature of the federal court judgment," and (2) "it is by no means clear that in *Merry* the cause of action asserted by plaintiff in the federal court action was the same cause of action as that asserted in the state court action . . . ." (*Mattson, supra,* 106 Cal.App.3d at pp. 453–454; see *Merry*, at pp. 227–228.)

The *Mattson* rule adheres to the primary rights theory long followed by California courts. "The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action. (*Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593].)" (*Crowley* v. *Katleman* (1994) 8 Cal.4th 666, 681 [34 Cal.Rptr.2d 386, 881 P.2d 1083].) "As far as its content is concerned, the primary right is simply the plaintiff's right to be free from the particular injury suffered. (*Slater*[, at p.] 795.) It must therefore be distinguished from the *legal theory* on which liability for that injury is premised: 'Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief.' (*Ibid.*) The primary right must also be distinguished from the *remedy* sought: 'The violation of one primary right constitutes a single cause of action, though it may entitle the injured party to many forms of relief, and the relief is not to be confounded with the cause of action, one not being determinative of the other.' (*Wulffjen* v. *Dolton* [(1944)] 24 Cal.2d 891, 895–896 [151 P.2d 846], italics deleted.)" (*Crowley*, at pp. 681–682.)

Here, despite the contrary view of the Court of Appeal majority, plaintiffs' section 1983 claim and their state law claims presented alternate theories of relief for the same injury, the shooting of the decedent. As recognized by the concurring opinion above, settled principles of law compel the conclusion that the state and federal claims in this case involve the same primary right. (*Mattson, supra*, 106 Cal.App.3d at pp. 447–448; see also, e.g., *Harris, supra*, 104 Cal.App.4th at p. 187; *Lucas, supra*, 47 Cal.App.4th at p. 286; *Swartzendruber* v. *City of San Diego* (1992) 3 Cal.App.4th 896, 908 [5 Cal.Rptr.2d 64].)

If primary rights were truly indivisible, then plaintiffs' state law claims would be precluded by the federal judgment whether it was plaintiffs or the federal court that split their cause of action. However, I do not suggest that the rule against splitting a cause of action admits no exceptions. Clearly, there are some situations in which the plaintiff cannot avoid a split, as where the defendant succeeds in removing the case from state to federal court and the federal court thereafter declines to hear state claims. Furthermore, like the *Mattson* court, I have no quarrel with the rule that, when state claims are dismissed by a federal court after a summary disposition of federal claims, claim preclusion does not apply. (*Mattson, supra*, 106 Cal.App.3d at p. 453.) In that circumstance, the plaintiff has had no occasion to realize that the court would not try the state claims, and cannot fairly be held responsible for failing to present all theories of recovery in one forum. In such limited circumstances, primary rights theory must bend in the interests of justice. (See *Slater* v. *Blackwood, supra*, 15 Cal.3d at p. 796.) However, an exception

to the rule of claim preclusion is not appropriate when a federal court declines to reach state law claims after *trying* federal claims based on the same primary right.

*Mattson* provides a clear, effective rule in this situation. It strikes the appropriate balance between the interests of the plaintiff in choosing a forum, the defendant in avoiding the vexation of relitigation, and the courts in the efficient administration of justice. The *Mattson* court recognized that it would be inappropriate to preclude a subsequent state court action *whenever* a federal court declines to exercise its supplemental jurisdiction over state claims. Such a rule "would have an unwarranted and unnecessary chilling effect upon the invocation of the jurisdiction of the federal courts in civil rights actions." (*Mattson, supra,* 106 Cal.App.3d at p. 454.) "However, when the federal court has been requested to and has declined to exercise pendent jurisdiction over the nonfederal claim, the plaintiff is presented with a new choice. He may proceed to trial on the federal claim or, usually, he may elect to dismiss the federal claim without prejudice (see Fed. Rules Civ.Proc., rule 41(a)(1)) and litigate both claims in the state court [citations]." (*Mattson,* at pp. 454–455, fn. omitted.)

If the federal court bifurcates state claims and proceeds to trial on a section 1983 claim alone, plaintiffs are in a similar situation. They may seek voluntary dismissal, and their state claims are preserved under the tolling provisions of 28 United States Code section 1367(d).[3] While the federal rules allow voluntary dismissal only by stipulation or court order after the answer is served (Fed. Rules Civ.Proc., rule 41(a), 28 U.S.C.), plaintiffs should be required to explore those alternatives in order to preserve their state claims. It would be particularly appropriate for the plaintiff to seek a stipulated dismissal in this situation. A defendant refusing to so stipulate should be barred from relying on the *Mattson* rule in subsequent state litigation.

If, instead, plaintiffs choose to go forward with only their section 1983 claim, they have opted for a trial on all the relevant facts, including "the events leading up to the shooting as well as the shooting." (*Billington v. Smith* (9th Cir. 2002) 292 F.3d 1177, 1190.) They should not be entitled to a second opportunity to litigate those facts simply because the federal court waited until after trial to dismiss the state claims. The procedure adopted by the federal court in this case invites the manipulation and multiplication of

---

[3] "The period of limitations for any claim asserted under subsection (a) [i.e., claims under the federal court's supplemental jurisdiction], and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." (28 U.S.C. § 1367(d).)

litigation that the *Mattson* court rightly feared. As a general rule, the principle of res judicata ought to foreclose state court litigation of a cause of action that has already been tried in federal court. No reason to depart from that rule appears in this case.

Baxter, J., concurred.